Good morning. I'd like to reserve about five minutes for rebuttal. My name is Ryan Billings from Conerman & Kalis, S.C. We represent the Wisconsin Appellants, who are businesses that purchase and consume natural gas to conduct their business operations. This appeal concerns an order granting summary judgment in favor of Defendant Appellee C.E.S. We believe the opinion should be reversed for three independent reasons. First, the opinion applies the wrong law. It considers whether two commonly owned companies, the Reliant Trading Subsidiary, R.E.S., and the Reliant Sales Subsidiary, C.E.S., conspired with one another to violate Wisconsin's antitrust laws. Under the Copperwell Doctrine, adopted by Wisconsin, these two entities are one single unit. They are incapable of conspiring with one another. Mr. Billings, I know this is tedious, but I'd like you to inform us, and with record citations if possible, what evidence there is, because it's a motion for summary judgment, evidence from which a reasonable jury could find that C.E.S. was indeed a 100% owned subsidiary of R.E.S. and that R.E.S. is admittedly a wash sale trader in the relevant period. Now, that's a very loaded question. We've met a lot of facts, but try to educate us on whether the basic principles of Copperwell, which is that a 100% owned subsidiary cannot be a separate person for Section 1 liability under the Sherman Act, which is very similar to the Wisconsin Antitrust Act, because a 100% owned subsidiary must share the purpose of its parent when the parent commits anti-competitive acts under Section 1. Got that? Okay. I do, and I'll answer them in the order that they were asked. First of all, the sales subsidiary C.E.S. was not a subsidiary of R.E.S. R.E.S., the trading subsidiary, was a common subsidiary of the old reliant parent. In the first year of the relevant time period, R.E.S. and C.E.S. were both directly owned by a company known as R.E.R.C. and indirectly owned by the overall reliant parent, which was Reliant Energy Incorporated. And I direct the court to C.E.S.'s responses to our statement of material fact on 123 to 141 of the record that will show you what we contended, the evidence and support, and C.E.S.'s response. It is uncontested that in the first year of the relevant time period, both C.E.S. and R.E.S. were commonly owned subsidiaries of the reliant parent. That changed- Is that old reliant? Old reliant. Reliant Energy Incorporated. Old reliant. All right. And that was 100%. That changed. In the second year? In the second year, they began the process of separation. A new company was created. It's the tail end of the first year, known as Reliant Resources, Inc., New Reliant. And that company was 83% owned by the old reliant parent until the last month, last two months of the relevant time period. So the structure was, there was the old reliant parent, Reliant Energy Incorporated, and R.E.S., the Reliant Trading Subsidiary, and C.E.S., the Reliant Sales Subsidiary, were all owned by the old reliant parent. That was in 2000. That was in 2000. 2001, January 1, old reliant transfers its wholesale power generation and trading business to New Reliant. New Reliant was- And C.E.S. was not owned by New Reliant. C.E.S. was not owned by New Reliant. It was owned by old reliant, as was R.E.S. And the new reliant took up R.E.S. It did, and it was owned 83% by Reliant Energy Incorporated, old reliant. And the case law, which we cited in our briefing, is that majority ownership is enough. It doesn't have to be 100%. The question is who controls. I understand. I'm just trying to understand here, because it seems to me, at that point, New Reliant owns R.E.S., and old Reliant owns C.E.S. Old Reliant still owns R.E.S. I understand. They own it through New Reliant. Correct. But because they had 83% of the stock. But I'll let you continue to answer Judge Bea's question. I only interrupted because I wanted to make sure I followed what you were telling him. Okay. And our point is, until the very last month of the relevant time period, both R.E.S. and C.E.S. were commonly owned by the same overall parent. I know it is very confusing, but we walked through it in record 123 to 141, and C.E.S. largely agreed with our- What is the time period? The relevant time period is January 1st of 2000 through October 31st of 2002. That's what I thought. So, in August 31st of 2002, old Reliant merged with a subsidiary of CenterPoint, right? It merged with what became the parent of CenterPoint. CenterPoint Energy, Inc., for one month, owned the entire Reliant empire, and then the next month, it spun off the New Reliant companies. Well, at that point, CenterPoint continues to own 83% of New Reliant, but they own all of C.E.S. That is correct. CenterPoint then distributes New Reliant stock, and both were independent companies. They were a spinoff, and as of October 1st of 2002, they were independently owned, although, as a practical matter, they shared many of the same investors, because it was a spinoff, and many of the old investors bought the new company. But yes, they were legally independent companies as of October 1st. As of September 30th. September 30th, October 1st. There's a dispute in the record. Well, but I didn't know which one either.  C.E.S. was concurrently a director, manager, or employee of R.E.S.? That is a very misleading statement. What it removes is the word officer very carefully. There was a common officer in 2000 who was an officer, the treasurer of both C.E.S. and R.E.S. at the same time, Mark Kilbride. So when C.E.S. made this argument to the district court, they cleverly left out the word officer, because there absolutely was commonality there. Well, I understand. So as I understand it, and I looked at all these briefs, so it seems to me there's no director, manager, employee, but there was a treasurer. There was a common officer, and in addition. Did any other officer besides the treasurer overlap during this 2000-2001 period of time? They didn't overlap at the subsidiary level, but many of the officers of C.E.S. were also high-level officers, the Reliant Parent, who also held positions with R.E.S. So the connection was both R.E.S. and C.E.S. were managed by the top executives of the company who worked together at the Reliant Parent level. So, for instance, Mr. McClanahan in our briefing was the chairman and a director of C.E.S. He was also a high-level president of the Reliant Parent, and he was in charge of the energy distribution group. Mr. Kelly, who was the secretary of C.E.S. and R.E.S., not concurrently, but during the relevant time period, was the general counsel of Old Reliant. And we demonstrated in our brief that there was a lot of overlap of that kind, including amongst Steve Letbetter, who was the CEO of the overall company, Stephen Nave, who was the CFO, and other gentlemen. Well, the reason I'm taking you through this is because I've got your chart, and I was comparing your chart to what I have alleged, and I'm just trying to make sure here. So did C.E.S. ever engage in proprietary trading on its own? It somewhat depends on how you define that. It did engage in swap trading, but it wasn't the kind of trading that R.E.S. did, which is on the market. So as I understand it, from the facts, C.E.S. would sell the gas and sometimes sell them in long-term contracts and might engage in some trading on the market simply to offset those long-term contracts that it had for the sale of the gas. But it wasn't really the same kind of trading we're talking about that was engaged in by its parent. It was engaged by R.E.S., the trading subsidiary. Did C.E.S. ever engage in any conduct which is alleged then against the other defendants other than simple this sale? We alleged in our complaint that the reliant entity functioned as one unit. I understand. But I understand your allegation. But honestly, your allegation really leads me only to say that what you're saying is because we have this case, Copperweld, that whatever the parent does, the subsidiary does. But what I'm trying to figure out is, is there any evidence that they ever engaged in any conduct that is alleged against the other defendants other than just the sale of the gas? That, you say, is part of the conspiracy. And I agree with your — I mean, I know what your allegation is. Is there any other conduct except the sale of the gas? That was — their role in the conspiracy was the sale of the gas. They did not participate in the round-trip trading, the false reporting, and they weren't doing the coordinating, which was the parent. But their role — Did they ever report gas prices? There's a dispute of fact about that. It looks like the reliant parent company reported some of their sales. But it was their policy, according to Mr. Sullivan, not to report. But others may have reported on their behalf. Okay. Then I have all the conduct during the relevant period. Okay. As per your allegation, which on summary judgment I have to take as true. Thank you. And I'll return to Justice — sorry, Judge Bea's question about the evidence of conspiracy, because I want to make sure I turn to that. Right, because we're here on an appeal for motion summary judgment. The allegations are simply framing the issues. What we have to look at is whether there's tangible and sufficient evidence to go to the jury. We agree, and that's why I direct you to CES's response to our statement of material facts on 123 to 141 of the record, because a lot of the evidence regarding the overall conspiracy, its intent, objectives, and results was undisputed by CES. And in particular, our allegations of conspiracy are in Record 135 to 140, Paragraph 62 to 71. And I'll review that evidence for the Court here. Reliant publicly admitted to roundtrip trading, it paid more than $100 million in fines and settlements with the CFTC, FERC, DOJ, SEC, and its own shareholders. That's Record 137 to 138, Paragraph 66. Jerry Fooch, an RES trader, pled guilty and was sentenced to a prison term of more than four years for false reporting to manipulate gas prices. That's Record 139, Paragraph 69. Your opponents say that all that is irrelevant because it wasn't CES doing it. That was their argument. And we have two answers to that. But they didn't deny it. They didn't deny it. That's true. For purposes of summary judgment, they did not substantively dispute this. You have a person who's accused of improper behavior. He says, I resent that remark, but I don't deny it. Exactly true. Well, better that than I resent the last one. And our point is, under Copperweld, because CES provided essential participation, they were the ones who offloaded the product at prices fixed by the other reliant companies. They were an essential participant, and their liability must be viewed collectively. But even if we lose on the Copperweld argument, on this record, there's enough evidence to conclude that CES was a knowing participant in the reliance scheme. And that includes their... What is that evidence? That's what you're giving me. What is that evidence? That's important to me. Sure. Because I'm not sure Copperweld cements your case. And that evidence was put in the record in the same SOF that I just referenced. They included number one. What does SOF mean? Statement of fact. Sorry, that was CES responses to our statement of fact at 123 to 141 in the record. And what we demonstrated was that reliant manipulated prices with the intent to sell gas at manipulated prices. CES was the entity that sold $200 million of overpriced gas, collected the overcharges from those sales, and distributed the profits to the reliant company. We put in evidence that CES's top officers and directors were part of the same group at the reliant parent that instructed traders to false report, that instructed traders to round-trip trade. And certainly they were part of the group that was receiving the red flags that were running up and down the company when the accounting department, the risk management department, and the controllers department were all saying these billion-dollar trades, where we're buying and selling or selling and then buying, seemed to lack a legitimate business purpose. But I guess, again, we're back to this. As to what they did, they did the selling, right? They did the selling. After having bought. Company A, B, and C also bought at the high price, and they sold. Are they a part of the conspiracy? The conspiracy moved the entire market, but there are only certain actors who are part of it. I mean, the problem comes in that it seems to me, unless you have some evidence, that CES did something, so we're relying on totally what the common ownership is or something like that, I'm having a tough time understanding what evidence we have that CES did anything different than any other third party who was buying gas from RES. CES was a captive company that bought gas at inflated prices, higher than even the other companies it bought from and sold it to the Wisconsin market. My time is done. Would you like me to answer the question or sit down? Yes, I would. And, frankly, I can bamboozle Bayer into giving me more time. Thank you. I would appreciate that. So CES played an essential sales role. Our argument is very simple, that you don't fix prices for a product unless you intend to sell that product at the prices you fixed. But be fair, and this is the extent of my question, be fair, they were selling this product not only to CES, because CES didn't buy 100% of the gas, they were selling this gas to A, B, C, D, and they were selling it at profit, too. And all CES did was the same thing that A, B, C, and D did. And yet, simply because the owners and directors, their owners and directors knew, they're in the conspiracy? It is not true that RES sold gas to other resellers in Wisconsin. The record shows they didn't sell to anybody else? RES was a wholesaler. It didn't sell to customers in Wisconsin. There's no evidence in the record that anyone other than CES was selling this gas to Wisconsin consumers. CES was the outlet. So because only CES bought it for Wisconsin, then your claim survives? I mean, there's certainly that RES sold this gas someplace else. Certainly they had it at other sales, but they are not part of this lawsuit simply because it's a Wisconsin buyer? I mean, South Carolina gets the gas. Should they be able to get in on the same theory? Well, the evidence in the record focuses on Wisconsin because it's a Wisconsin case. There were other Reliant sales subsidiaries in other parts of the country, and no question RES probably sold to them, too, under the same scenario. But in Wisconsin, which is the antitrust case we have alleged, CES sold $200 million of gas. It was the outlet that RES used, that Reliant used, to sell all the overpriced gas. My question is very simple. If more people than CES bought this gas at the high prices RES was getting by having done all of this illegal activity, then why is CES liable other than because they were part of the whole? Our argument is that the Reliant entity didn't make a buck. On this record, there's no evidence that any profit was realized until CES sold gas to Wisconsin consumers. That was how the essential objective of the conspiracy was achieved, and that's where the antitrust injury occurred, when the consumers bought overpriced gas. Well, didn't that also occur when RES was selling the gas to other people besides CES? Didn't they also then get their money? If we're going to say that's the conspiracy arm that CES was, aren't we also saying that those others who bought the gas from RES also contributed to the conspiracy? And so, again, back to my same question, the only way you get CES is because it's a part of the whole. And what I'm telling you is that there's nothing on the record to say what RES did, that it sold gas to anyone else. I'm guessing that it sold to other Reliant sales subsidiaries in other parts of the country. Billings, you made some mention earlier on that even if we don't apply copper weld, we should reverse because the CES officers and directors and employees knew that RES was playing hares and hounds in their trading, right? We did. Now, picking up on Brother Smith's question, is mere knowledge that manipulation, anti-competitive manipulation is taking place by a person in the chain of commerce from which a buyer takes product and then sells it and then sends the money on, is that enough or is it under Section 1 or does it have to be purpose? Under Wisconsin law, knowledge and an act in furtherance is sufficient to establish antitrust liability. So where is the evidence that CES officers, directors, and employees knew that RES was manipulating? Give me the citation of that. Sure. And the overlapping roles, which is the foundation of what I'm about to tell you, is at R133 to 135. And those are the answers to requests to admit undisputed facts? Yes. And your requests to admit undisputed facts have citations to the record? They do. And the failure to deny those undisputed facts, a claim, objection, claims they're irrelevant, are not denials of the undisputed facts? That's correct. Thank you very much. Right. And my point, based on those facts, I want to tell you how that knowledge was imputed to the company, CES. And that was that the reliant executives at the highest level were telling traders to false report and round-trip trade. That group included David McClanahan, who was the chairman and the director of CES. It included Mr. Kelly, who was receiving these reports of these billion-dollar trades that leap off a financial page because they're buying and selling gas in the same volume at the same price in quick succession. They were the people receiving these consolidated reports where these trades were reported. And Mr. Kilbride, who was the treasurer of both CES and RES, was all over this. There were alarm bells being raised all over the company by the accounting department, by the controllers' department, by the risk management group, that these trades seemed to lack a legitimate business purpose. Mr. Kilbride, in that department, acquired that knowledge. And under Wisconsin law, the knowledge of the officers of a company are imputed to the company constructively. So CES knew what was going on because it was managed by the same people who were directing other parts of the company to do it. We've taken you past your time. Thank you. Thank you very much. We'll hear from the defendant, Apolise. Good morning. May it please the Court. My name is Mark Robeck, and I'm here on behalf of Defendant Apolise Centerpoint Energy Services. Now, I think as the Court has already explored, CES is not like any other defendant in this case. CES did not engage in any alleged improper trade. Speak up a little bit more. Sure, Your Honor. CES did not engage in any of the alleged improper trading. CES did not report prices to publishers. CES was never charged or implicated in any wrongdoing by any of the government agencies that investigated this conduct. Let me take the points that were made by Mr. Billings and ask you a couple of questions on that. As to the first point, do you agree or disagree with Mr. Billings that Copperweld attributes the purpose of the conspiracy to CES through the common ownership of CES and RES by Old Reliant and New Reliant? Well, I disagree, Your Honor. Will you tell me why? Yes, sir. Yes, sir, absolutely. So in the first instance, as far as the ownership goes, and I think our chart on page 9 kind of… Page 9 of what? I'm sorry, of our brief, sort of spells out the ownership structure. But the key point of that is that CES was never owned in part, in whole, at all by either of the Reliant defendants in these cases. There was the common ownership during the business separation of the Old Reliant. But there was never any ownership by either of the defendants in these cases at all, period, none. So CES was affiliated through the old structure with RES, and RES was the operating subsidiary that was involved in the allegations that are part of the lawsuits. Let's define our terms. By affiliated, do you mean that CES was owned 100 percent by RES? No, sir. I mean that CES was indirectly owned by the Old Reliant at the same time that RES was indirectly owned by the Old Reliant. 100 percent? For part of the time period, 100 percent. And what time period was that? That was during 2000. 2001 or 2002? Beginning on January 1st, 2001, it changed. So during 2000. All right. On January 1st, 2001, there were public stockholders for a portion of Old Reliant. 17 percent. Yes, and then New Reliant was formed that was put in place of or in between Old Reliant and RES. So at that point, New Reliant owned 100 percent of RES. And who owned CES? CES was owned indirectly 100 percent by Old Reliant. So as I understand it, Old Reliant owned all of CES and 83 percent of RES's parent. Correct. Correct. But, Your Honor, I guess the key point here is I really don't think that matters. Because under Copperweld, I think they make too much of Copperweld in the ownership structure here. Because when you look at Copperweld, Copperweld very specifically was looking at whether under Section 1, the agreement among parents and subsidiaries could form an agreement in restraint of trade. That's what Copperweld looked at, was is this an agreement in restraint of trade? And they said also, and I think this is important because this also goes to the Lennox decision, and they said, however, this rule applies to Section 1 because, of course, families of corporations can still be liable under Section 2 for monopolization. In other words, there can be an agreement to monopolize, which would violate Section 2, but an agreement in restraint of trade would not violate Section 1 because parents and subsidiaries are engaged in competition with other parents.  And they talked about it also in America Needle as there may be a gap that some people think Congress should have filled, but that's not the case. The case is with parents and affiliates, it doesn't make sense that they can engage in an agreement to restrain trade. No bathtub conspiracies. No bathtub conspiracies, correct. However, how can there be no independent liability for a coordinated activity between a parent and a subsidiary due to the complete unity of interest and suddenly no unity of interest between CSRES and Reliant? I don't quite follow what you mean when you say and suddenly, no. Well, don't take out the suddenly. It seems to me that there's no independent liability for coordinated activity between the parent and the subsidiary, which is what Copper Weld holds because of a complete unity of interest, and yet it seems to me there's a unity of interest between CSRES and Reliant. I mean, the whole conspiracy would not have happened if it hadn't been for, if you will, CES's part therein. Oh, well, I disagree with that completely, Your Honor, because the evidence is actually that CES operated independently, and they bought gas from lots of suppliers, and they bought gas at the lowest possible cost. And so there wasn't really a unity of interest. As Your Honor suggested earlier, CES was simply a retail supplier that was buying gas from wholesale sellers, many of them. RES was one of them. But I think the key point there is that here there is no evidence that CES even knew of the alleged misconduct. The plaintiffs referred to- What about this, what he just talked about in Reliant and having the David- David McClanahan. David McClanahan, Hugh Kelly and- Mark Kilbride. And Kilbride getting all the information. Well, the evidence isn't that they got the information or that they knew what was going on. There is no evidence that they knew what was happening during this relevant time period. It's just not there, Your Honor. Counsel, your opposing side cited ER 133 to 135. Those are requests for admission of unqualified undisputed facts. Do you have a different view as to the content of those pages? Completely different view, Your Honor. My view is when you look at what those allegations are and what the underlying evidence they reference, it's conduct by RES. It's not conduct by CES. And they never pursued whether any of the CES- I'm not talking about conduct. I'm talking about knowledge of conduct. Did CES-do you dispute that CES had knowledge of the conduct of RES in doing their manipulative trading? Yes. Yes, I do. I do. Because, first off, the record of Mr. Sullivan was that they acted independently. Second off, the evidence that they cite to is not evidence that any of those three officers knew about the alleged conduct. It's just evidence that the conduct occurred, which came out after the California energy crisis, after all this happened and there were investigations of what was going on. That's what they're referencing. It's not reference that any of these officers knew about it. It's only referencing evidence that it may have occurred on the reliant side. They leap. But if the officers are there for both, I guess it seems to me that the chart that your opponent gave us pretty well indicates that there are common officers. Yes, sir. And if there are common officers, do you disagree with that? No, sir. So you agree there are common officers? I do. Do you also disagree that what CES did did not fulfill the last, if you will, element of the conspiracy? In other words, that the gas sold by CES bought from RES was really the only way to get the money into the corporation? I disagree with that completely. Okay. Why? Because CES, when they bought the gas from Reliant, they were buying it at the alleged inflated prices. Yes. It was already. And RES was simply. Well, that's the only way for RES to get the money. Well, RES is just standing there as a reseller. I'm sorry, CES. They can do all this, if you will, exchange and drive the price up, and yet the only way to really make the money is the final sale at the driven up price, which is exactly what CES provided them. Buy it at the drive up price and sell it and give all the money to us. That's the end of the conspiracy. That's the last, if you will, leg of what he's alleging. I understand that, Your Honor, but RES clearly did not depend on CES to sell gas because they sold gas all over the country. They wouldn't even be here if it didn't originate in California with the energy crisis and the following up investigations. It just so happens that CES was a retail seller of gas to customers that didn't buy regulated gas from their LDC. And there are a bunch of companies that operate in Wisconsin just like that. RES wasn't dependent on CES in any way, shape or form to sell gas. It's just not. They weren't. And CES wasn't. Well, I don't know. I guess I'm trying to figure out how they weren't. If, in fact, they're the end result of the ability to get the money in from the conspiracy to raise the price, I'm having a tough time understanding how they weren't the last leg of the conspiracy. And the knowledge imputed by the common officers who know about it. Well, it was the last leg of the sales process. It certainly wasn't the last leg of the conspiracy. Well, there was no reason for the conspiracy unless they could make the sale of the gas. The gas sale, getting the money in for raising all the prices up, is the only reason you do it. And CES provided that. And you're saying there were other people who could have sold the gas that would have sent the same profits up the chain, right? Yeah. But did they have common ownership? Did they have common officers? There were others, Your Honor. But the profits through the alleged conspiracy is the sale by RES. That's when they make their profits. And CES was just standing there as a retail seller. RES didn't sell all their gas to CES. They sold it to lots of people. And CES didn't buy all their gas from RES. They bought their gas from lots of people. So it was just serendipitous that you had these companies within, for part of the time period, the same family, where there was a retail seller and where there was RES. So RES, for example, made money if they sold the gas to one of the other defendants or if they sold the gas to Enron, who wasn't an end customer. It was just RES was in the wholesale business, buy gas and resell it, not to retail customers. So it didn't depend on a retail company to make profits, assuming the alleged conspiracy is true. I'm just taking those allegations. It just needed to sell the gas. That's all it needed to do. And so CES is no different than any other retail provider. And the evidence in the record, what the judge was presented with was that CES operated independently of RES, didn't know about the misconduct, didn't depend on RES, and that they were completely independent. That is the evidence that was presented to the court and is not rebutted. It's in Mr. Sullivan's deposition. It's in his declaration. And what they do is present evidence of RES misconduct without ever connecting the dots to show that CES even knew about it. They simply failed to connect the dots. Thank you very much. Thank you, Your Honor. Mr. Billings, you have two minutes for rebuttal. Thank you, Your Honors. I want to just make four quick points. The first is I think the panel understands the ownership structure, but if there's any doubt, look at page 9 of their brief and circle Old Reliant on the top. It was the parent that ruled all. Second, there are disputes of fact up and down this record, including many of the things that Mr. Robeck just said. He said that CES was just buying at the lowest cost. Well, we have those purchase records in the record. They were Exhibit D to my affidavit, MDL 2355-1. And those records show that RES was often the highest cost. There were many other lower sellers, but CES was still buying it. Third, Mr. Robeck tries to characterize the wrongdoing as occurring at the RES level only. That's not what the record says. The record says that Reliant was involved at the highest level, and that's 135 to 140 of the record. With respect to dependents, there's another dispute of fact about that. We put in the record at 125 to 131 that the companies were very dependent on one another. All they offered in return was Mr. Sullivan's testimony. Mr. Sullivan was an office manager in Minneapolis. He reported to someone who reported to someone who reported to CES's officers and directors. He was a low-level employee. He did not speak to the officers and directors. He did not review any of their documents, which were never pulled. And he didn't do any investigation as a 30B6 witness into the knowledge and participation of CES's officers, even though those were notice topics. The court didn't ask me any questions about the Rule 56D motion. But the point I want to make is that if you believe there's not enough evidence to get to the jury on the issue of intent, how would we get that evidence? We'd depose the officers and directors. We'd search their e-mails. That was never done. We asked for it, and the district court simply ignored a Rule 56D motion. If the panel has any questions, I'm happy to answer them. Otherwise, I'll submit. Thank you. Thank you very much, Mr. Billings. And thank you, Mr. Robeck. And thank you for a very interesting and illuminating presentation. And now we'll go to the next case, which is reorganized FLI, Inc. versus CMS Marketing Services and Trading Company. Please proceed. Thank you, Your Honor. David Frederick for Farmland. I'd like to reserve three minutes for rebuttal, if I could, please. This case concerns the application of the NYMEX class action settlement to release an individual plaintiff's antitrust case that was pending at the time of that class action settlement. We asked this court to reverse the district court's dismissal of our suit for three reasons. First, by its plain terms, the release does not cover our claims. Second, our claims could not be encompassed by the settlement because they arise out of different facts. The identical factual predicate rule applies to bar the settlement from releasing our claims. And third, if you were to disagree with me on either of those two points, the due process clause is implicated and the settlement cannot bar our claims consistent with due process because class counsel did not adequately represent Farmland's interests in the NYMEX suit. If I could go back to the release language and give the court the precise way that we get to our conclusion that the district court aired, we start on page ER-210, which is the language of the release in the NYMEX settlement. And that language, by its plain terms, releases only, quote, claims, then dot, dot, dot, arising from or relating to trading in NYMEX natural gas contracts. That's at ER-210. Our claims arise from bilateral physical gas sales. If the drafters had intended the defendant's interpretation, they would have omitted the word NYMEX and just referred to, quote, natural gas contracts. Clearly the NYMEX class settlement was intended to cover only those transactions that occurred on NYMEX. And they said so directly in the release. The word claims also is important. What do we do with the language, and I'm just putting it here, relating to, and then there's a later phrase therein, including without limitation state antitrust laws? Those, that again has to relate to the claims arising out of trading in NYMEX natural gas contracts. Yes, I'm trying to figure out why it does. Our claims do not arise out of contracts arising. I understand. You're getting out because you say it's not NYMEX. But when I read the phrase, and the phrase says relating to, and later on in the same phrase says including without limitation state antitrust laws, I guess I'm trying to figure out why that doesn't say it doesn't just have to be NYMEX. The reason is that if you had a NYMEX contract, Judge Smith, that also implicated a state antitrust prohibition, this release would cover that. Our claim, even though it is a state antitrust claim, does not arise out of a NYMEX transaction. Our transactions all were bilateral physical gas transactions. Farmland is a company based in Kansas that was buying physical gas. Sometimes it was buying it on the cash market in the moment, and none of the purchases that are at issue in our case arose out of a NYMEX contract. As I understand it, then what you're saying is your case is a physical purchase of natural gas, but not physical natural gas purchased due to a contract under NYMEX. That's correct. Are you resting your interpretation of the release on any known canons of interpretive law? Yes. What canon is that? Well, the canon that applies under New York law where the NYMEX settlement was struck is the canon that the class release cannot go beyond the capacity of the class representatives to release claims. There were no allegations of physical gas sale manipulation in the NYMEX class action. There were no class representatives in the NYMEX class action who represented the interests of buyers like Farmland. And so the canon of construction, and this comes from the consolidated Edison case that we cite in our briefs, and also importantly the Super Spuds case that Judge Friendly wrote for the Second Circuit, is the notion that the class representative can only release what the class representative represents. You cannot expand the release in a class action that goes beyond what the interests of the class are. And here what the defendants are seeking to do is to use a broadly worded release and broaden it even further to encompass transactions that were — that could not have been represented. If they had attempted to have been represented, that would have violated the scope of the class representative's capacity and the identical factual predicate rule because those facts go beyond what the class representative had the authority to release. But didn't the release in the NYMEX case also deal with sales of physical natural gas? Yes. That's also wording at ER-210. But the important words, Judge Bea, are, quote, pursuant to a NYMEX natural gas contract. And our point is that our contracts were not NYMEX natural gas contracts that gave rise to these allegations of manipulation. So your claim is the class representative can only settle what the class representative claims. Correct. But it goes on to say whether or not asserted in this action. That's right. And the point is that no class representative in NYMEX was in Farmland's position. It didn't buy bilaterally. It didn't actually deliver or buy physical gas. It only bought through NYMEX contracts. Correct. And it only — and none of them bought for their own use. Our company was a company that bought the physical natural gas and used it to make fertilizer and used it to feed livestock for purposes of that. But your 30B6 deponent testified that Farmland fairly frequently purchased NYMEX contracts as a hedge. That's correct. But those hedging contracts are not implicated in this case because what we are talking about here is the manipulation that affected our natural gas purchases. Now, importantly, if you look at the claims form, and this is at excerpts of record page 103, there's no reference in the claims form in the NYMEX class settlement to any losses that occurred from physical natural gas sales or physical gas sales wholly apart from NYMEX transactions. Every place where a putative class member would be required to fill out what their losses were has to do with a NYMEX transaction, not the kinds of transactions that Farmland entered into. And why is this important? Because, Judge Beah, at page ER208, when the district court in NYMEX approved the class settlement, the court said there were, quote, no competing cases. Our case was pending at the time that class action settlement was struck. And for the district court to say there were no competing cases, I think, is very clear evidence that our case was not intended to be encompassed within the NYMEX settlement. The defendants were the same defendants in our case as in the NYMEX. Virtually all of them were the same. They obviously had an interest in including our case if they thought it would have been encompassed by the settlement release. They didn't ask for it to be included, nor did they ask the district court to reassert jurisdiction in the NYMEX in order to sweep our case in. So I think it's very clear that what the court in NYMEX was dealing with was NYMEX trading manipulation and not the kind of manipulation of the physical gas sales that harmed Farmland and caused it to go into bankruptcy. Now, if I could go to the second point, which is the identical factual predicate rule, bilateral sales are different than the exchange traded options contracts that were at issue. I think we understand that, but your time is up. All right. I'll save the rest for rebuttal, please. Thank you. You mean you were three seconds over. That's all right. We'll give you a couple of minutes. With whatever indulgence the court will give me. Thank you. May it please the court, Mark Haddad, Sidley Austin. We represent CMS, and I'm on behalf of all the appellees this morning. So I'd like to respond directly to my colleague's approach to the case, which is to say that the physical contracts are sort of a separate universe from the financial instruments that are traded on NYMEX. What were you saying? You said the physical contracts and future contracts that were traded through the NYMEX are different from bilateral contracts entered into by users. Yes, exactly. And that's what I'd like to respond to. And the shortest answer I can give the court is really to return to ER 263 through 271. That's the deposition testimony of the enterprise risk manager. And to look hard at that testimony in light of the representation and the approach this morning, because the two are irreconcilable. The first thing we see when we look at the testimony is that the effective price, the cost of the gas, the cost of this physical input, in the risk manager's words, is the NYMEX transaction cost. What that means, and the reason it's so important, is that if that NYMEX price was manipulated, and in fact if it was higher than it should have been, then Farmland indeed suffered a loss. But the loss is measured by the distortion on NYMEX. And that's precisely what the NYMEX class action was there to allow recovery for. And so there is no separate injury here for a company like Farmland, who was a hedger and who said they hedged all of their purchases. So let's go through this in a little more detail so the court can really see that that's what the testimony is. And then we'll see how it really answers the due process, the identical factual predicate, all of the issues that they have raised, including the plain language of the release. So to see that the effective cost of the input is the NYMEX price, look at the example that Farmland's witness gave. He said, you know, we know in January that we're going to need a certain amount of gas in July. And we're uncertain what the price will be at the time we need to do this physical gas transaction in July. So to have that certainty, we buy a futures contract on the NYMEX exchange for the amount that we know we're going to need. And he says, let's assume that's $220. So I buy the NYMEX contract for $220 per million BTUs. And then we know that's going to be the cost of gas to us in July. He specifically says on page 266, lines 5 through 9, that the effective cost of the input to us will be $220. And then he goes on to explain it works out that way whether we end up in our physical trade paying $3, so the cost of physical gas went up, because whatever we pay more for the gas, for the physical gas that's delivered to us, that extra price is offset because we settle our financial trade for the same amount higher when we settle out on NYMEX. Same thing if we end up paying less for the gas than we planned, $1.50 in his example. We still end up paying $220 in effect for our gas because we're going to lose that $0.70 when we settle our financial trade. Explain that, Mr. Haddad, to me. If he has a future contract which delivers gas in June at $220, but when June comes, he has to buy physical gas at $3. Right. How does he pay $220? Because he settles the financial contract, the NYMEX contract ends up settling at $3. Oh, I see. He sells his contract to receive at $220, but at the price that day at $3, so he picks up $0.80 on that contract. Exactly. Which he puts over on the $3. Gotcha. Exactly. And he's very clear in saying that at ER270, he says, so we got $0.80 in profit from the hedge, which is what locks in that $2.20 price for us. That's line 17 through 19 at ER270. So he ends up paying the NYMEX future price, not the physical price. Exactly. That is the cost. That is the cost of the gas to them. That's supposing that every physical gas contract is hedged. That is so, and there's not material evidence to the contrary in this record. They've never made an argument that they weren't offsetting. And when you read the testimony that is in the excerpts of record, you see that that was their approach. They were trading on NYMEX to hedge their physical purchases, and, you know, if they weren't doing physical purchases, then they weren't hedging. He says that specifically. We take the hedges off when we don't need. Can you give me a citation to that? Yes, it's in our brief, Your Honor, and I will look in a moment for the page, but it would be in that same 263 to 272 place in the ER. So this is so critical because it doesn't mean they couldn't have been injured. Okay, because in his example, for example, he's paying $2.20. Now, if the NYMEX is manipulated and, you know, the non-manipulated price would have been $2.00 in January. Well, then, they're paying $2.20, so it's $2.20 instead of $2.00, so it's a 20-cent injury. That's what the hedger can claim in the NYMEX settlement. Now, you don't have to stay in the NYMEX class if you don't want to. We know, and, in fact, I noticed this just preparing for this morning. If you go to ER 215, you can see who opted out, and E&J Gallo opted out. And E&J Gallo brought a separate lawsuit for its physical purchases, which, in fact, reached this court. A court decided E&J Gallo's case at 503 F3rd 1027. So you could opt out if you don't want to be part of that settlement. Otherwise, you're in the settlement, and the precise claim of this cost differential, paying too much for gas, for a hedger should, at least very appropriately, could have been brought there. Our argument depends, I think, on a fact, and that is that every one of the claims for losses on physical contracts was hedged by Farmland. I don't think so, Your Honor. I understand the question, but this is an extraordinarily broad release. We're not relying on the broadest language of it, frankly, this morning, because we think it's clear they are meaningfully a hedger. You would agree that the NYMEX release doesn't affect E&J Gallo? Because they opted out. Because they opted out. Right. Because they opted out. And different questions might be presented that we don't really have to confront about the language about the state antitrust claims or other relate-in-any-way type of arguments if there was a limit to the hedging. Wouldn't Farmland be entitled to the damage it suffered under the manipulated price under physical contracts which were not hedged? Certainly possibly. The court would have to work through the other language in the release. And if the court would decide, yep, that other language doesn't pull in that, then, yes, then our argument doesn't work for those transactions that aren't hedged. But I think there's some... Therefore, they can pursue those. They could, assuming the court were to reject the other arguments that one would have if you had somebody who really was just a partial hedger. It was a... And certainly if it was de minimis, if you really weren't hedging or you hedged one trade in your life or something like that, then maybe you would say, look, this is not really directed at that. Although... But here, when you have the enterprise risk manager come on and say, this is how we purchase gas, he says, our transactions went hand-in-hand. This is... We wanted certainty, so we hedged all of our physical purchases. Or at least he doesn't identify any material amount that they didn't. Was he asked that? I don't think he was specifically asked that. But my colleague really doesn't deal with this part of the transcript. Because when you see what's going on here, you see that their claims arose squarely in the NYMEX settlement. And they got notice. They were represented by... Cornerstone Propane was a marketing company. At ER250, the first opponent for farmland goes out of his way to say, we bought gas not just from natural gas producers, but from marketing companies. What marketing companies do is buy physical gas and then sell physical gas. And they have an incentive to hedge as well. If they want to lock in the price at which they can sell it six months from now, they will put on a hedge. Now, there's no robust factual record about Cornerstone's physical gas purchases and whether they were a hedger and so forth. That argument was not raised below. We didn't have the opportunity to develop it. But we can see from ER250, we can see from Cornerstone's description of itself in the complaint it brought. We can see from Judge Marrero in the 2nd District. Judge Marrero's class certification order, footnote 6, defines hedger at page 183, footnote 6. And then at page 185, concludes that the named plaintiffs are adequate to represent a class that includes hedgers specifically. And hedgers are again approved as part of the class definition for the settlement. And the references in the notice and the settlement claims are replete with references to hedgers. We've cited them in our briefs. And hedgers, in fact, had to give additional context on their claims forms precisely so the court could understand their physical trading positions. So this is set up to allow hedgers to recover. This is no different than the Walmart and the Raines-Pastabella decisions of the Second Circuit and of this court, where you have somebody trying to challenge a settlement, a large settlement, $100 million settlement in this case, after the fact, bringing a collateral attack. I mean, the most material difference is at least Raines-Pastabella objected to the settlement in real time in the Second Circuit before pursuing its separate action. Here, really, Farmland had the keys. It got notice. It could opt out, bring its claim, you know, for all of its physical gas purchases like E.N.J. Gallo did, or stay in and submit its claim form. What it can't do is not opt out, stay in the class, and then try to say that somehow its physical gas purchases were wholly unrelated to the hedging. Thank you, Mr. Hadley. We've taken you over your time. Thank you. Your Honors, not a dollar, not one dollar in the NYMEX class settlement went to anyone who purchased physical gas. And they can't show that a single dollar was. And if you look at the claims form, there's no place for a purchaser of physical gas to report where they would have gotten any damage from the NYMEX contracts. How do you rebut Mr. Haddad's explanation that you recovered in the class action based on NYMEX futures contract the damages that you would have recovered on the physical gas contracts? Well, there's no place on the NYMEX form to do that trade and to show where that trade would have released damages. That's point one. Point two is they have taken the testimony out of context because the farmland deponent said there was hedging but not hedging the bulk of it on the NYMEX markets at all. It was hedging done with other financial institutions. And so we now have we don't have any argument now anymore that the release was intended only to cover NYMEX. Now it's being expanded to cover any kind of hedging that might have occurred. Was the price determined by NYMEX? I beg your pardon? Wasn't the price through other hedgers determined by not NYMEX? That's a fact question that would be disputed that is subject to trial. The district court decided this case is plainly on just the plain language of the release, which my friend spends very little time trying to defend. He spends most of his time arguing that the deposition testimony somehow swept farmland's activity. But that's not how the district court dismissed this case. It dismissed this case on the supposed breadth of the scope of the release that was said to encompass us. And there are no damages in the NYMEX that would cover us. For purposes of record citations, I know the court views that as especially important. The majority of farmland's hedging was not on the NYMEX market. That's not in the excerpts of record prepared for this court. But it is Exhibit 10 to our summary judgment motion in the record below. There are also citations at 263 of the excerpts of record and 253 that indicate that not all of farmland's transactions were hedged. So they were engaging in physical gas purchases that were not protected through hedging activity. Those certainly would be susceptible to a damages claim in a case such as this. Thank you very much, Mr. Frederick. We've taken your time. Thank you, Your Honor. Thank you. The case of Arendelle, pardon me, the reorganized FLI versus Oniok is submitted for determination. And that completes our calendar. We are in adjournment for the week. Thank you very much.
judges: Bea, N.R. Smith, Lasnik